JEFFERY D. TROWBRIDGE, Bar No. 100390
Attorney at Law
180 Grand Avenue
Suite 1550
Oakland, California  94612

Telephone:     (510) 893-5300
Facsimile:      (510) 832-7228

Attorney for Moving Party and Secured Creditor,
CMR COMMERCIAL MORTGAGE FUND, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:

DONNA FLAVETTA,

    Debtor.

_____/

Case No. 09-48542 EDJ 11

OBJECTION TO CONFIRMATION OF PLAN OF REORGANIZATION BY CMR COMMERCIAL MORTGAGE FUND, LLC, HOLDER OF FIRST DEED OF TRUST ON 463 KILKARE ROAD, SUNOL, CA)

Date:          June 24, 2010
Time:         2:30 p.m.
Courtroom:  215
                    1300 Clay Street
                    Oakland, CA
Judge:        Hon. Edward D. Jellen

**OBJECTION TO CONFIRMATION OF PLAN OF REORGANIZATION**

    CMR Commercial Mortgage Fund, LLC ("CMR"), holder of the first deed of trust against the real property at 463 Kilkare Road, Sunol, California (the "Property") (securing a loan with a current balance of approximately $3,291,604.43), objects to the Debtor's Plan of Reorganization filed on April 23, 2010 (the "Plan"), as follows:

**I.  INTRODUCTION.**

    In a nutshell, the Plan operates as follows: CMR's Cash Collateral will be the sole source of financing to pay (1) the Debtor's other secured creditors on the Property, (2) the Debtor's priority and general unsecured creditors, and (3) the Debtor.  In return for being compelled to fund a "visionary" and dubious plan to save Debtor's stake in the Property, CMR (whose loan matured on October 1, 2009) will be locked into a new five year loan at a

drastically reduced interest rate without concrete (or any) evidence that Debtor can generate a sufficient cash flow to fund and maintain both her operations and obligations under the plan. As Debtor's attorney stated at the recent preliminary hearing on CMR's motion for relief from stay, Debtor's plan is merely a visionary scheme whereby she hopes that, if she can postpone repayment to CMR for such five year period, the Property will appreciate to such a value that she might actually then have an equity interest in the Property. As discussed below, such appreciation would have to close a current gap of a difference between a $2,500,000 value and $4,000,000 in encumbrances. Debtor can offer no evidence that such gap will close (and, in the current economic climate, it is far more likely to increase). CMR is not required to fund Debtor's visionary scheme with its Cash Collateral. It would be unfair and inequitable to force CMR to accept below market returns and to postpone repayment to its investor (CALPERS) for the sole purpose of allowing Debtor to gamble that the real estate market will dramatically increase over the next five years.

## II. OBJECTION TO CONFIRMATION OF THE PLAN.

### A. The Plan is Not Feasible [11 U.S.C. Section 1129(a)(11)].

A plan fails to meet the "feasibility" test under 11 U.S.C. Section 1129(a)(11), if confirmation of the plan is likely to be followed by liquidation or a need for additional financial reorganization. A plan proponent must present "concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan ... . Such a requirement prevents the confirmation of visionary schemes ... ." (Coones vs. Mutual Life Ins. Co. of New York, 168 B.R. 247, 255-256 (D. Wyo. 1994); In re D&G Investments of West Florida, Inc., 342 B.R. 882 (Bankr. M.D. Fla. 2006); In re Rack Engineering Co., 200 B.R. 302 (Bankr. W.D. Pa. 1996).

In the instant case, Debtor is in default on the obligation owed to Secured Creditor dating back to December, 2008. The obligation has fully matured and was due and payable as of October 1, 2009. Despite similar "visionary" claims during the Spring, Summer and Fall of 2009, Debtor was unable to generate sufficient operating income from the Property to pay a single penny of the $27,000.00 monthly loan payments accruing to CMR during such period of

time. During such period of time, she also was unable to make any payments on the obligations secured by 2nd and 3rd deeds of trust and accumulated other unsecured obligations.

According to Debtor's Operating Reports filed for the first four months of her bankruptcy proceeding (September to December, 2009), she had total receipts over such four month period of $22,157.00, and net receipts of $11,266.00 (i.e., about $2,816.50 per month). During such period of time, she continued to make no payments whatsoever on any of the secured obligations against the Property.

Debtor's Operating Reports for 2010 show a fair amount of creativity in accounting. In January, 2010, she reported "payments from Ellston of $10,000" and a net increase in cash of $6,383. In February, 2010, she reported total receipts of $20,000 and net receipts of $13,641. However, in March, 2010, she reported that she had to return $7,000 "to Elliston for cash flow," while at the same time reporting "commission from Elliston" of $20,000. This accounting resulted in net receipts of $9,057. In April, 2010, she reported a decline in "commission from Elliston" to $9,000 and added an item under "rent/leases collected" of $11,000. This resulted in a net increase in cash for such month of $17,662. CMR suspects that Debtor is stating higher income than is actually being earned for purposes of beefing up her statements in anticipation of prosecuting her Plan and that future "reversals" will be coming.

At best, however, Debtor's net receipts as stated by her in her Operating Reports average $10,579 per month during 2010, but only about $7,654 per month over the seven months of her bankruptcy proceeding. Given that Debtor's business apparently is one in which deposits are received in the spring for summer engagements and where winter engagements are slow or nonexistent, it is appropriate to look at her year around earning ability. CMR would further note that Debtor's net receipts as set forth in her Operating Reports have been calculated without any meaningful deductions for Debtor's actual living expenses, the actual operating expenses for the Property, or property taxes and insurance relating to the Property. The return of $7,000.00 to Elliston, for its "cash flow" during March, 2010, would further suggest that it is more likely that Debtor will actually receive "net" commissions and rents after April, 2010, of less than the reported amounts.

CMR disputes that the 5% proposed by Debtor is a fair rate of return on her proposal to extend its loan by an additional 60 months (which would, in effect, turn this 2 year bridge loan into an 8 year loan). However, even if that were a fair rate of return, it is clear that Debtor's proposal in her Plan to make payments to creditors totaling $15,393.00 per month ($12,500 to CMR, $2,558.33 to Golden Valley Mortgage, and $334.67 to unsecured creditors (10%)), plus actual operating expenses of the Property, property taxes and insurance, and her own living expenses, is purely visionary. Debtor cannot meet her burden of showing "concrete evidence" of a sufficient cash flow to meet such obligations. Thus, her Plan is not feasible and cannot be confirmed.

**B. The Plan is Not "Fair and Equitable" with Respect to CMR [11 U.S.C. Section 1129(b).**

The Plan is not "Fair and Equitable" with regard to Secured Creditor (11 U.S.C. Section 1129(b)(2)(A)(i)). CMR denies that the proposed 5% interest rate constitutes the appropriate time value of its money in light of the risks involved (particular, the admitted risk that CMR's loan is presently under-secured and the lack of any evidence that property values have started to appreciate or will appreciate during the next five years). The contract rate of interest is 12% and the default rate of interest is 18%. Required monthly payments by the Debtor, should the contract rate of interest be determined to be the appropriate rate of interest for the risks involved, would be approximately $32,916.04 per month to CMR alone, more than 1.5 times the Debtor's best and highest estimate of the "gross income" of the Property.

In order for a plan to be "fair and equitable" under 11 U.S.C. Section 1129(b)(1), "total deferred payments [to a secured creditor] must have a 'present value' equal to the amount of the allowed secured claim." (In re Bryson Properties, XVIII, 961 Fed.2d 496, 500 (4th Cir. 1992). "Present value" includes the "time value of money" and involves a determination of the appropriate discount rate "in light of the risks involved" (id., at p. 500, fn. 4). As discussed above, Debtor's Plan proposes that CMR receive deferred payment of the entire principal balance of the Note, with a 5% interest rate over 5 years, 7 points lower than the non-default rate agreed to by the parties under the Note for a 2 year period. Because the Plan proposes a

---

below market interest rate for a deferred stream of payments, it fails to provide CMR with the "indubitable equivalent" of its secured claim (11 U.S.C. 1129(b)(2)(A)(iii); 7 Collier on Bankruptcy, Section 1129.05[2][c]). Such failure to provide CMR with the "indubitable equivalent" of its secured claim is exacerbated by the Plan's proposal to deprive CMR of its Cash Collateral (provided for under the terms and conditions of its Note and Deed of Trust) and to divert such Cash Collateral to Debtor's own living expenses, operating expenses and to claims of other under-secured and unsecured creditors.

In the present case, the Debtor has no equity in the Property, as shown by the approximate agreed market value of $2,500,000.00 compared to the approximate $4,060,604.43 total of the liens against the property. Given the lack of equity, CMR is entitled to relief from the automatic stay unless the Debtor shows that the property is necessary to an effective reorganization. The Property, having no value and having an insufficient income stream to make payments to CMR alone, much less to Debtor or to any other creditor, cannot add anything positive to a feasible reorganization or liquidation. Therefore, such property is not necessary to an "effective reorganization" (Bankruptcy Code Section 362(d)(2)(B)). Therefore, CMR's requested relief from stay should be granted and confirmation of the Plan should be denied.

Dated: June 6, 2010

LAW OFFICES OF
JEFFERY D. TROWBRIDGE


By: /s/ Jeffery D. Trowbridge
JEFFERY D. TROWBRIDGE,
Attorney for Secured Creditor,
CMR COMMERCIAL MORTGAGE
FUND, LLC

---